**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**NORTHERN DIVISION**

**EARL BEVILLE**, individually and on behalf of all others similarly situated,

Contact through attorneys: Barnow and Associates, P.C., 205 W. Randolph St., Suite 1630, Chicago, IL 60606

County of Residence: Sullivan County, TN

**Plaintiff**,

v.

**ANNE ARUNDEL DERMATOLOGY, P.A.**,

Address: 1306 Concourse Dr., Suite 201, Linthicum Heights, MD 21090

County of Residence: Anne Arundel County, MD

**Defendant**.

Case No. 1:25-cv-02384

CLASS ACTION

JURY TRIAL DEMANDED

**CLASS ACTION COMPLAINT**

Plaintiff Earl Beville ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through his attorneys, brings this Class Action Complaint against Defendant Anne Arundel Dermatology, P.A. ("AAD" or "Defendant"), and complains and alleges upon personal knowledge as to himself and information and belief as to all other matters.

**INTRODUCTION**

1. Plaintiff brings this class action against AAD for its failure to secure and safeguard approximately 1,905,000 individuals', including Plaintiff's, personally identifying information

("PII") and personal health information ("PHI"), including names, addresses, dates of birth, medical information, and health insurance information.

2. AAD is a dermatology healthcare provider with locations in states across the Mid-Atlantic and Southeast.

3. Between approximately February 14, 2025, and May 13, 2025, an unauthorized third party gained access to AAD's network systems and accessed and acquired files containing the PII/PHI of AAD's patients, including Plaintiff and Class members (the "Data Breach").

4. AAD owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. AAD breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect its patients' PII/PHI from unauthorized access and disclosure.

5. As a result of AAD's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of himself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately February 14, 2025, and May 13, 2025.

6. Plaintiff, on behalf of himself and all other Class members, asserts claims for negligence, negligence per se, breach of fiduciary duty, breach of implied contract, unjust enrichment, and violations of the Maryland Consumer Protection Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## PARTIES

***Plaintiff Earl Beville***

7. Plaintiff is a citizen and resident of Tennessee.

8. Plaintiff obtained healthcare services from AAD. As a condition of providing healthcare services to Plaintiff, AAD required Plaintiff to provide it with his PII/PHI.

9. Based on representations made by AAD, Plaintiff believed that AAD had implemented and maintained reasonable security and practices to protect his PII/PHI. With this belief in mind, Plaintiff provided his PII/PHI to AAD in exchange for receiving healthcare services from AAD.

10. At all relevant times, AAD stored and maintained Plaintiff's PII/PHI on its network systems, including the systems impacted in the Data Breach.

11. Plaintiff received a notice from AAD notifying him that his PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12. Had Plaintiff known that AAD does not adequately protect the PII/PHI it collects and maintains, he would not have agreed to provide AAD with his PII/PHI or obtained healthcare services from AAD.

13. Plaintiff has experienced fear, frustration, and stress because his PII/PHI was accessed and stolen by unauthorized third parties in the Data Breach, including because he must closely monitor his PII/PHI for signs of misuse and identity theft for the rest of his life.

14. As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of his highly sensitive PII/PHI; time and effort

lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of his PII/PHI.

***Defendant Anne Arundel Dermatology, P.A.***

15. Defendant Anne Arundel Dermatology, P.A. is a Maryland professional corporation with its principal place of business located at 1306 Concourse Drive, Suite 201, Linthicum Heights, MD 21090. It may be served through its registered agent: Angela R. Peterman, M.D., 877 Baltimore Annapolis Blvd., Suite 100, Severna Park, MD 21146.

## JURISDICTION AND VENUE

16. The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C. § 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy exceeds $5,000,000, exclusive of interest and costs.

17. This Court has general personal jurisdiction over Defendant because it is organized under the laws of this State and maintains its principal place of business in this District.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's principal place of business is in this District and a substantial part of the events, acts, and omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

***Overview of AAD***

19. AAD is a dermatology practice offering medical, surgical, and cosmetic dermatology services.[1] AAD has 165 trained clinicians and operates more than 65 locations in Florida, Georgia, Maryland, North Carolina, Pennsylvania, Tennessee, and Virginia.[2]

20. In the regular course of its business, AAD collects and maintains the PII/PHI of its patients, including Plaintiff and Class members. AAD requires patients to provide it with their PII/PHI, including the PII/PHI stolen in the Data Breach, before it provides them healthcare services.

21. AAD's website contains a Notice of Privacy Practices (the "Privacy Policy") that describes how AAD may use and disclose its patients' PII/PHI, including for treatment, payment, or health care operations.[3]

22. In the Privacy Policy, AAD acknowledges it has a duty to safeguard patients' PII/PHI. The Privacy Policy states, "Anne Arundel Dermatology, its covered entity practice sites, and other affiliated entities are legally required to protect the privacy of your health information."[4]

23. AAD informs patients that for any use or disclosure of PII/PHI not described in the Privacy Policy, AAD will obtain their written authorization.[5]

---

[1] *Our Services*, ANNE ARUNDEL DERMATOLOGY, https://aadermatology.com/services/ (last accessed July 21, 2025).

[2] *See id.*; *Locations*, ANNE ARUNDEL DERMATOLOGY, https://aadermatology.com/locations/ (last accessed July 21, 2025).

[3] *Notice of Privacy Practices*, ANNE ARUNDEL DERMATOLOGY (Apr. 6, 2021), https://aadermatology.com/hipaa-privacy-notice/ (last accessed July 21, 2025).

[4] *Id.*

[5] *Id.*

24. AAD promises patients it will notify them in the event of a breach of their unsecured PII/PHI.[6]

25. In the Privacy Policy, AAD tells its patients it must follow the practices described in the Privacy Policy.[7]

26. Plaintiff and Class members are current or former patients of AAD who entrusted their PII/PHI to AAD in exchange for healthcare services.

***The Data Breach***

27. Between approximately February 14, 2025, and May 13, 2025, an unauthorized third party gained access to AAD's network systems and accessed and acquired files containing the PII/PHI of Plaintiff and Class members.[8] Following an investigation, on or about May 20, 2025, AAD determined that files accessed in the Data Breach contained personal and health information.[9] The files accessed and stolen in the Data Breach contained the PII/PHI of Plaintiff and Class members, including at least names, addresses, dates of birth, medical information, and health insurance information.[10]

28. While AAD learned patient information was stolen by approximately May 20, 2025, it waited until approximately July 11, 2025 to begin notifying its patients that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[11]

---

[6] *Id.*
[7] *Id.*
[8] *Notice of Data Breach*, CAL. ATT'Y GEN. (July 11, 2025), https://oag.ca.gov/system/files/AAD_IDX%20Notification%20Letter%20-%20Final.pdf.
[9] *See id.*
[10] Steve Alder, *Dermatology Practice Data Breach Affects 1.9 Million Patients*, HIPAA J. (July 15, 2025), https://www.hipaajournal.com/anne-arundel-dermatology-data-breach/.
[11] *See Notice of Data Breach*, *supra* note 8.

29. AAD's failure to promptly notify Plaintiff and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

***AAD Knew that Criminals Target PII/PHI***

30. At all relevant times, AAD knew, or should have known, that the PII/PHI that it collected, shared, and stored was a target for malicious actors. Indeed, AAD states in its Privacy Policy that it will alert patients in the event of a breach of their PII/PHI. Despite such knowledge, AAD failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that it should have anticipated and guarded against.

31. It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[12]

32. Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in

[12] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

2024.[13] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[14]

33. PII/PHI is a valuable property right.[15] The value of PII/PHI as a commodity is measurable.[16] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[17] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[18] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

34. As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

---

[13] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed July 21, 2025).

[14] *See id*.

[15] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[16] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[17] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD ILIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[18] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

35. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[19] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[20]

36. All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[21] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[22]

37. Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[23] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[24]

---

[19] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").
[20] *Id.*
[21] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.
[22] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.
[23] Steager, *supra* note 19.
[24] *Id.*

38. Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[25]

39. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

***Theft of PII/PHI Has Grave and Lasting Consequences for Victims***

40. Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[26] [27]

41. Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying

---

[25] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

[26] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed July 21, 2025).

[27] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[28]

42. Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[29]

43. Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records that can plague victims' medical and financial lives for years."[30] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[31] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[32] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[33]

---

[28] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[29] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed July 21, 2025).

[30] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[31] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 22.

[32] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed July 21, 2025).

[33] *Id.*

44. A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

a. Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

b. Significant bills for medical goods and services neither sought nor received.

c. Issues with insurance, co-pays, and insurance caps.

d. Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

e. Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

f. As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g. Phantom medical debt collection based on medical billing or other identity information.

h. Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[34]

45. There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[35]

---

[34] *See* Dixon & Emerson, *supra* note 30.
[35] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019),
http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

46. It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

47. Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession; and (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach.

## CLASS ALLEGATIONS

48. This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

49. Plaintiff brings this action on behalf of himself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

50. Excluded from the Class are Anne Arundel Dermatology, P.A. and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

51. Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of his claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

52. The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. AAD has reported that the Data Breach affected approximately 1,905,000 persons.[36]

53. Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a. Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b. Whether Defendant had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c. Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d. Whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard the PII/PHI of Plaintiff and Class members;

e. Whether Defendant breached its duties to protect Plaintiff's and Class members' PII/PHI; and

f. Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

54. Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of himself and all other Class members. Individual

---

[36] *Cases Currently Under Investigation*, DEP'T HEALTH & HUM. SERVS. (July 11, 2025), https://ocrportal.hhs.gov/ocr/breach/breach_report.jsf.

questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

55. Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had his PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

56. Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that he has no interests adverse to, or that conflict with, the Class he seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

57. A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

58. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

59. AAD owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI in its possession, custody, or control.

60. AAD knew or should have known the risks of collecting, storing, and sharing Plaintiff's and all other Class members' PII/PHI and the importance of maintaining secure systems and procedures. AAD knew or should have known of the many data breaches that targeted companies that collect and store PII/PHI in recent years.

61. Given the nature of AAD's business, the sensitivity and value of the PII/PHI it maintains and shares, and the resources at its disposal, AAD should have identified the vulnerabilities to its systems and prevented the unauthorized disclosure of PII/PHI and the Data Breach from occurring.

62. AAD breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to it—including Plaintiff's and Class members' PII/PHI.

63. It was reasonably foreseeable to AAD that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would

result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

64. But for AAD's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

65. As a result of AAD's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in AAD's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT II
## NEGLIGENCE PER SE

66. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

67. AAD's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

68. AAD's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by a business, such as AAD, of failing to employ reasonable measures to protect and secure PII/PHI.

69. AAD violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by disclosing Plaintiff's and Class members' PII/PHI to an unauthorized third party, by failing to provide timely notice, and by not complying with applicable industry standards. AAD's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and stores, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

70. AAD's violation of the HIPAA Privacy and Security Rules and Section 5 of the FTCA constitutes negligence per se.

71. Plaintiff and Class members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

72. The harm occurring as a result of the Data Breach is the type of harm that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

73. It was, or should have been, reasonably foreseeable to AAD that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by

failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

74. The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of AAD's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased and imminent risk of identity theft and medical identity theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their PII/PHI; (iii) breach of the confidentiality of their PII/PHI; (iv) deprivation of the value of their PII/PHI, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) overpayment for the services that were received without adequate data security.

## COUNT III
## BREACH OF FIDUCIARY DUTY

75. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

76. Plaintiff and Class members gave AAD their PII/PHI in confidence, believing that AAD would protect that information. Plaintiff and Class members would not have provided AAD with this information had they known it would not be adequately protected. AAD's acceptance and storage of Plaintiff's and Class members' PII/PHI created a fiduciary relationship between AAD and Plaintiff and Class members. In light of this relationship, AAD must act primarily for

the benefit of its patients, which includes safeguarding and protecting Plaintiff's and Class members' PII/PHI.

77. Due to the nature of the relationship between AAD and Plaintiff and Class members, Plaintiff and Class members were entirely reliant upon AAD to ensure that their PII/PHI was adequately protected. Plaintiff and Class members had no way of verifying or influencing the nature and extent of AAD's data security policies and practices, and AAD was in an exclusive position to prevent unauthorized access and guard against the Data Breach.

78. AAD has a fiduciary duty to act for the benefit of Plaintiff and Class members upon matters within the scope of their relationship. It breached that duty by, *inter alia*, failing to properly protect the integrity of the system containing Plaintiff's and Class members' PII/PHI, failing to comply with the data security guidelines set forth by HIPAA, and otherwise failing to safeguard Plaintiff's and Class members' PII/PHI that it collected and stored.

79. As a direct and proximate result of AAD's breaches of its fiduciary duties, Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in AAD's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## COUNT IV
## BREACH OF IMPLIED CONTRACT

80. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

81. In connection with receiving healthcare services, Plaintiff and all other Class members entered into implied contracts with AAD.

82. Pursuant to these implied contracts, Plaintiff and Class members paid money to AAD, directly or through their insurance, and provided AAD with their PII/PHI. In exchange, AAD agreed to, among other things, and Plaintiff and Class members understood that AAD would: (1) provide services to Plaintiff and Class members; (2) take reasonable measures to protect the security and confidentiality of Plaintiff's and Class members' PII/PHI; and (3) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

83. The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and AAD, on the other hand. Indeed, as set forth above, AAD recognized the importance of data security and the privacy of its patients' PII/PHI in its Privacy Policy. Had Plaintiff and Class members known that AAD would not adequately protect their PII/PHI, they would not have sought healthcare services from AAD or agreed to provide it with their PII/PHI.

84. Plaintiff and Class members performed their obligations under the implied contract when they provided AAD with their PII/PHI and paid for healthcare services from AAD.

85. AAD breached its obligations under its implied contracts with Plaintiff and Class members by failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and failing to implement and maintain security protocols and procedures to protect

Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

86. AAD's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the unauthorized disclosure of their PII/PHI and the Data Breach, and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

87. Plaintiff and all other Class members were damaged by AAD's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) they lost time and incurred money to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) they overpaid for services that were received without adequate data security.

**COUNT V**
**UNJUST ENRICHMENT**

88. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

89. This claim is pleaded in the alternative to the breach of implied contract claim.

90. Plaintiff and Class members conferred a monetary benefit upon AAD in the form of monies paid to AAD for healthcare services and through the provision of their PII/PHI.

91. AAD accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. AAD benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was necessary to facilitate AAD's healthcare operations and billing services.

92. As a result of AAD's conduct, Plaintiff and Class members suffered actual, measurable damages in an amount equal to the difference in value between their payments made with reasonable data privacy and security practices and procedures, that Plaintiff and Class members paid for, and those payments without reasonable data privacy and security practices and procedures, that they received.

93. AAD should not be permitted to retain the money belonging to Plaintiff and Class members because AAD failed to adequately implement the data privacy and security procedures for itself that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

94. Plaintiff and Class members have no adequate remedy at law.

95. AAD should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT VI
## VIOLATION OF THE MARYLAND CONSUMER PROTECTION ACT
## Md. Comm. Law Code §§ 13-101, et seq. ("MCPA")

96. Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

97. Plaintiff, Class members, and AAD are each a "Person" under MCPA § 13-101(h).

98. Plaintiff and Class members are "Consumers" pursuant to MCPA § 13-101(c).

99. AAD is a "Merchant" pursuant to MCPA § 13-101(d).

100. AAD committed "Unfair or Deceptive Trade Practices" under § 13-301 of the MCPA by failing to provide adequate data security while telling Plaintiff and Class members that it will adequately keep their PII/PHI private.

101. The MCPA provides 15 examples of what constitutes an unfair, abusive, or deceptive trade practice. *See* MCPA § 13-301. AAD's actions constitute an unfair, abusive, or deceptive trade practice in at least the following categories:

a. "False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers" MCPA § 13-301(1);

b. "Representation that . . . [c]onsumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not" MCPA § 13-301 (2)(iv);

c. "Failure to state a material fact if the failure deceives or tends to deceive" MCPA § 13-301 (3); and

d. "Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with . . . [t]he subsequent performance of a merchant with respect to an agreement of sale, lease, or rental" MCPA § 13-301 (9)(iii).

102. Had Plaintiff and Class members been aware of the omitted and misrepresented facts, *i.e.*, that AAD would not adequately protect their PII/PHI, Plaintiff and Class members would not have provided their PII/PHI to AAD.

103. Pursuant to MCPA § 13-408, Plaintiff brings this claim on behalf of himself and all other Class members for the damages that they have experienced as a result of the Data Breach.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in his favor and against Defendant as follows:

A. Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B. Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C. Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of himself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D. Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E. Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F. Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: July 22, 2025

Respectfully submitted,

By: /s/ *Zachary E. Howerton*

Zachary E. Howerton (Bar No. 20688)
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN PLLC**
223 Duke of Gloucester Street
Annapolis, MD 21401
Telephone: (410) 269-6620
Facsimile: (410) 269-1235
zhowerton@milberg.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Attorneys for Plaintiff and the Proposed Class*

**Pro hac vice* forthcoming